# EXHIBIT A

ELECTRONICALLY FILED - 2021 Mar 31 12:16 PM - ANDERSON - COMMON PLEAS - CASE#2021CP0400615

| | |
|---|---|
| STATE OF SOUTH CAROLINA | IN THE COURT OF COMMON PLEAS |
| COUNTY OF ANDERSON | FOR THE TENTH JUDICIAL CIRCUIT |

| | |
|---|---|
| Walter Blohm, Janice K. Blohm, Samuel D. Chaney, Linda Davy, and Sara Kilpatrick, | Civil Action No: |
| Plaintiffs, | **SUMMONS** (Jury Trial Demanded) |
| Vs. | |
| Shurwest LLC, | |
| Defendant. | |

YOU ARE HEREBY SUMMONED and required to answer the Complaint in this action, a copy of which is hereby served on you, and to serve a copy of your Answer to the said Complaint upon the subscribers at 1329 Blanding Street, Columbia, South Carolina 29201, within thirty (30) days after service hereof, exclusive of the day of such service, and if you fail to answer the Complaint within the time aforesaid, judgment by default will be rendered against you for the relief demanded in such Complaint.

Respectfully submitted,

s/ Robert G. Rikard

Robert G. Rikard (SC Bar 12340)
Jeremy C. Hodges (SC Bar 71123)
George M. Pappas, Jr. (SC Bar 103963)
1329 Blanding Street
Columbia, SC 29201
Post Office Box 5640 (29250)
PH: (803) 978-6111
FAX: (803) 978-6112
EMAIL: rgr@rplegalgroup.com
        jhodges@rplegalgroup.com
        gmp@rplegalgroup.com

1

ELECTRONICALLY FILED - 2021 Mar 31 12:16 PM - ANDERSON - COMMON PLEAS - CASE#2021CP0400615

*Attorneys for Plaintiffs*

March 31, 2021
Columbia, South Carolina

ELECTRONICALLY FILED - 2021 Mar 31 12:16 PM - ANDERSON - COMMON PLEAS - CASE#2021CP0400615

| | |
|---|---|
| STATE OF SOUTH CAROLINA | IN THE COURT OF COMMON PLEAS FOR THE TENTH JUDICIAL CIRCUIT |
| COUNTY OF ANDERSON | |

| | |
|---|---|
| Walter Blohm, Janice K. Blohm, Samuel D. Chaney, Linda Davy, and Sara Kilpatrick | Civil Action No: 2021-CP- |
| Plaintiffs, | **COMPLAINT** (Jury Trial Demanded) |
| vs. | |
| Shurwest LLC, | |
| Defendant. | |

Plaintiffs bring this Complaint against Defendant Shurwest LLC.

## INTRODUCTION

Between March 2017 and March 2018, J. Christopher Dixon and Black Harbor Wealth Management (together, "Dixon")[1] provided insurance and financial advisory services to Plaintiffs directly and through their employees, agents, and representatives. For each of them, Dixon recommended that Plaintiffs employ a strategy for creating "tax-free" retirement income by using existing assets to establish and fund Indexed Universal Life ("IUL") insurance policies (the "IRA Reboot"). As recommended to and implemented for Plaintiffs by Dixon, the IRA Reboot included the recommendation and sale of IUL policies. The IRA Reboot also utilized a third-party funding mechanism for the IUL policies. This funding mechanism was not suitable for Plaintiffs. Shurwest introduced Dixon to the IRA Reboot and the third-party funding mechanism. As a result of the

---

[1] J. Christopher Dixon and Black Harbor are not parties to this action. Plaintiffs have resolved, by agreement, all disputes and claims against Dixon and Black Harbor arising out of the events described herein.

1

ELECTRONICALLY FILED - 2021 Mar 31 12:16 PM - ANDERSON - COMMON PLEAS - CASE#2021CP0400615

unsuitable insurance and retirement-planning recommendations by Shurwest, Plaintiffs have suffered substantial damages.

## THE PARTIES

1.    Walter Blohm and Janice Blohm are citizens and residents of Oconee County, South Carolina.

2.    Samuel Chaney is a citizen and resident of Greenville County, South Carolina.

3.    Linda Davy is a citizen and resident of Anderson County, South Carolina.

4.    Sara Kilpatrick is a citizen and resident of Oconee County, South Carolina.

5.    Shurwest, LLC is a corporation organized and existing under the laws of the State of Arizona that maintains its principal place of business in Arizona.  Shurwest is an independent marketing organization ("IMO") that markets, distributes, and advises insurance agents and investment advisors on the sale of insurance products. Shurwest also provides training, product education, operational support, and marketing to its network of insurance agents and investment advisors.

## JURISDICTION AND VENUE

6.    The Court has subject matter jurisdiction over Plaintiffs' claims for relief as the actions and omissions occurred in this County.

7.    The Court has personal jurisdiction over Shurwest, as it conducted substantial and continuous business in South Carolina, utilized agents in South Carolina, utilized the U.S. Mail, and internet to promote the IRA Reboot Program to Plaintiffs in South Carolina, and handled financial transactions on behalf of Plaintiffs who are residents of South Carolina.

ELECTRONICALLY FILED - 2021 Mar 31 12:16 PM - ANDERSON - COMMON PLEAS - CASE#2021CP0400615

8.    One or more individuals traveled to South Carolina as an agent and employee of Shurwest for the purpose of educating and training Dixon on the IRA Reboot Program, IUL policies, and the third-party funding mechanism.  Shurwest and its agents and employees provided ongoing support and assistance to Dixon as he sold and implemented the IRA Reboot Program with Plaintiffs and other Dixon clients here in South Carolina.

9.    Venue of this case is proper in Anderson County.

## STATEMENT OF FACTS

10.    At all times relevant to the events described in this Complaint, Melanie Schulze-Miller was an employee of Shurwest with the title of National Director for Life Insurance.  At all times relevant to the events described in this Complaint, Ms. Schulze-Miller and other agents and employees of Shurwest were acting within the course and scope of their employment with Shurwest.  As such, Shurwest is responsible and liable for the acts and omissions of Ms. Schulze-Miller and its other agents and employees under the doctrine of *respondeat superior* and vicarious liability.

11.    Shurwest negligently designed, promoted, marketed, recommended, and implemented a program to sell life insurance products as a retirement and financial planning strategy.  Plaintiffs suffered harm that was proximately caused by their participation in this program.

12.    Shurwest agents and employees created, promoted, and implemented a marketing and sales program known as the IRA Reboot.  These agents and employees did so with Shurwest's knowledge, approval, and support, with the help of other Shurwest

ELECTRONICALLY FILED - 2021 Mar 31 12:16 PM - ANDERSON - COMMON PLEAS - CASE#2021CP0400615

employees, and with the aid of Shurwest's monetary and non-monetary resources. *See*, Affidavit of Tami Hill, attached as Exhibit A.

13.    Shurwest maintains a nationwide network of insurance agents and retirement advisors. From at least 2016 to 2018, Shurwest promoted the IRA Reboot Program to its network of insurance agents and retirement advisors.

14.    The essence of IRA Reboot Program was to encourage Shurwest agents to recommend life insurance products as part of their clients' retirement and financial planning strategies.

15.    Shurwest designed the IRA Reboot Program, promoted it to Shurwest's network of insurance agents, educated and trained the agents on the IRA Reboot Program, assisted agents in processing applications for insurance policies, interacted with insurers, handled insurance policies, and supported and assisted agents at every step of the process in the IRA Reboot Program. Shurwest influenced and controlled each step of the IRA Reboot Program.

16.    Dixon was a Shurwest network agent. Shurwest advised, recommended, educated, and trained Dixon on the IRA Reboot Program. Shurwest aided Dixon in selling the Program to his clients, including Plaintiffs, and provided support and assistance in implementing the Program for Dixon's clients, including Plaintiffs.

17.    Miller, as an agent and employee of Shurwest, traveled to South Carolina to meet with Dixon and other members of his staff for the explicit purpose of promoting, educating, and training Dixon and his staff on the IRA Reboot Program.

18.    Dixon also traveled to Shurwest's headquarters in Arizona for additional meetings and training. During these meetings, Shurwest pitched Dixon on the IRA

ELECTRONICALLY FILED - 2021 Mar 31 12:16 PM - ANDERSON - COMMON PLEAS - CASE#2021CP0400615

Reboot and introduced him to Shurwest team members that would help Dixon promote and sell the IRA Reboot.

19.    Shurwest paid for all expenses related to Dixon's trip to Arizona and arranged to have a limousine pick Dixon up at the airport when he arrived.

20.    Shurwest agents and employees provided ongoing support to Dixon as he marketed, sold, and implemented the IRA Reboot with his clients.  Shurwest provided client specific guidance, ran illustrations, and provided documents and material to share with clients, including Plaintiffs.

21.    The IRA Reboot Program had multiple steps.  First, Shurwest and Dixon recommend that Plaintiffs liquidate their more traditional, existing savings (often 401(k) and IRA accounts) or convert home equity to cash.  Second, Shurwest and Dixon advised Plaintiffs to use the liquidated funds to purchase expensive, complex IUL policies as part of their new retirement and financial planning strategy.  Plaintiffs accepted these recommendations and ultimately participated in the IRA Reboot Program.

22.    Shurwest introduced Dixon to the IRA Reboot Program and represented that it was a legitimate and sound retirement and financial planning strategy for their clients.  This was a misrepresentation.

23.    Shurwest represented to Dixon that the expensive, complex IUL policies would provide his clients with a death benefit, like traditional life insurance policies, and that they would also accumulate cash value.  Shurwest also represented to Dixon that his clients would be able to borrow against the accumulated cash value of the IUL policies to supplement their retirement income in a tax advantageous manner.  This was a misrepresentation.

ELECTRONICALLY FILED - 2021 Mar 31 12:16 PM - ANDERSON - COMMON PLEAS - CASE#2021CP0400615

24.    In an IUL policy, all premium payments above the cost of insurance (*e.g.* the amount of the policy's death benefit) are directed into an internal investment account by the insurance company. The value of that investment account is referred to the accumulated value or cash value of the policy.

25.    The IRA Reboot Program recommended that Plaintiffs make premium payments in an amount sufficient to raise the cash value of their policy to a specified target level based on Plaintiffs' available assets and retirement income needs. When fully funded, policyholders can access the accumulated cash value of the IUL policy by taking out tax-free loans against it.

26.    Plaintiffs would theoretically not have to pay back the IUL policy loans during their lifetime because the amount of the loans are limited to the policy's accumulated cash value and the insurance company uses the death benefit to pay off any accrued interest. As such, the IRA Reboot Program marketed these IUL policy loans as tax-free supplemental retirement income.

27.    Relying on the representations, education, training, and guidance provided by Shurwest, Dixon represented to Plaintiffs that the IUL policies would provide Plaintiffs with a death benefit and would also accumulate cash value that Plaintiffs could borrow against in retirement to supplement their income. This was a misrepresentation.

28.    Relying on the representations of Shurwest, Dixon also represented to Plaintiffs that the IRA Reboot Program and its' underlying strategies were legitimate and sound retirement and financial planning strategies. This was a misrepresentation.

29.    These and other representations by Shurwest were misrepresentations. The IRA Reboot Program is not a legitimate and sound retirement and financial planning

ELECTRONICALLY FILED - 2021 Mar 31 12:16 PM - ANDERSON - COMMON PLEAS - CASE#2021CP0400615

strategy. Moreover, IUL policies as illustrated and sold by Shurwest and Dixon are not suitable for Plaintiffs and are not a sound and appropriate retirement and financial planning product.

30.     Plaintiffs relied on these and other misrepresentations of Shurwest and suffered harm as a result.

31.     Shurwest also recommended the use of third-party funding mechanisms in conjunction with the IUL policies.

32.     Shurwest introduced and educated Dixon on the third-party funding mechanisms. Shurwest aided Dixon in selling the third-party funding mechanisms to his clients, including Plaintiffs.

33.     Shurwest represented to Dixon that the third-party funding mechanisms would allow their clients to fully fund their universal life insurance policies faster and at higher levels. This was a misrepresentation.

34.     Shurwest also represented to Dixon that the third-party funding mechanisms were sound and appropriate tools to use in conjunction with the IUL policies, and that the third parties administering the funding mechanisms were reputable and legitimate operations. This was a misrepresentation.

35.     Shurwest also represented to Dixon that the money their clients invested with the third parties administering the funding mechanisms would be safe and secure. This was a misrepresentation.

36.     Relying on the representations, training and guidance provided by Shurwest, Dixon advised Plaintiffs to use the third-party funding mechanisms to fully fund

ELECTRONICALLY FILED - 2021 Mar 31 12:16 PM - ANDERSON - COMMON PLEAS - CASE#2021CP0400615

their universal life insurance policies faster and at higher levels.    This was a misrepresentation.

37.    Relying on the representations of Shurwest, Dixon also represented to Plaintiffs that the third parties administering the funding mechanisms were reputable and legitimate operations that could be a trusted.  This was a misrepresentation.

38.    Relying on the representations of Shurwest, Dixon also represented to Plaintiffs that they money they invested with the third parties administering the funding mechanisms would be safe and secure.   This was a misrepresentation.

39.    Based on the recommendation, training, and guidance provided Shurwest, Dixon recommended the IRA Reboot Strategy to his clients, including Plaintiffs.

40.    Plaintiffs participated in the IRA Reboot Program and have suffered losses caused by their participation in the Program.

41.    Dixon relied on Shurwest to conduct all due diligence on the IRA Reboot Program, IUL policies, and the third-party funding mechanisms.  Dixon relied on Shurwest to investigate and understand the risks of the IRA Reboot Program, IUL policies, and the third-party funding mechanisms before recommending them.

42.    Shurwest knew and understood that Dixon was relying on Shurwest to conduct due diligence to evaluate the risks associated with IRA Reboot Program, IUL policies, and the third-party funding mechanisms.

43.    Shurwest either failed to conduct due diligence or failed to conduct adequate due diligence on the IRA Reboot Program, IUL policies, and the third-party funding mechanisms before recommending them to Dixon or failed to accurately advise Dixon as to those risks.

ELECTRONICALLY FILED - 2021 Mar 31 12:16 PM - ANDERSON - COMMON PLEAS - CASE#2021CP0400615

44.    As a result of the misrepresentations, failures, and omissions of Shurwest, Dixon failed to conduct due diligence or failed to conduct adequate due diligence on the IRA Reboot Program, IUL policies, and the third-party funding mechanisms before recommending them to Plaintiffs.

45.    As a result of the misrepresentations, failures, and omissions of Shurwest, Dixon failed to understand the risks of the IRA Reboot Program, IUL policies, and third-party funding mechanisms before recommending them to Plaintiffs.

46.    As a result of the misrepresentations, failures, and omissions of Shurwest, Plaintiffs were deprived of the benefit of adequate due diligence and received inaccurate and misleading information regarding the risks associated with the IRA Reboot Program, IUL policies, and the third-party funding mechanisms before deciding to participate in the IRA Reboot Program.

47.    Had Plaintiffs received accurate information regarding the IRA Reboot Program, IUL policies, and the third-party funding mechanisms and the risks associated with them, both collectively and individually, they would not have participated in the IRA Reboot Program.

48.    Shurwest provided ongoing assistance to Dixon as he sold and implemented the IRA Reboot Program with Plaintiffs.  Shurwest provided assistance at every step of the process, including but not limited to providing guidance on specific client issues, creating program illustrations for clients, and providing materials to be shared with clients.

49.    Shurwest also accepted insurance policy applications from Dixon, forwarded those applications to insurance companies, interacted with insurance

ELECTRONICALLY FILED - 2021 Mar 31 12:16 PM - ANDERSON - COMMON PLEAS - CASE#2021CP0400615

companies regarding the applications, and accepted policies when issued before conveying them to Dixon.

50.    Upon information and belief, Shurwest agents and employees also altered and falsified information on Plaintiffs' insurance applications before submitting them to the insurance companies.  Upon information and belief, a former Shurwest employee has been indicted and pleaded guilty to a charge of falsifying insurance applications.

51.    Shurwest agents and employees also took measures to prevent the insurance companies from knowing the true source of the funds Plaintiffs were using to pay their IUL policy premiums.

52.    Shurwest agents and employees provided similar education, training, and assistance to other agents in South Carolina, who also sold the IRA Reboot Program to their clients.

53.    The primary funding mechanism recommended by Shurwest and Dixon was a structured cash flow product sold by Future Income Payments, LLC, f/k/a Pensions, Annuities and Settlements, LLC and FIP, LLC ("FIP").

54.    FIP acquired the rights to future income payments from individual pensioners, including retired teachers, police officers, and military personnel.  FIP offered the pensioners up-front, lump-sum payments in exchange for the rights to receive a portion of their monthly pension payment for a specific term.

55.    FIP characterized these pensioner transactions as "purchases," but numerous state and federal regulators ultimately determined that they were loans. Regulators also determined the loans were unlawful because FIP was not a licensed lender, the loan terms violated usury laws, and lacked legally required disclosures.

ELECTRONICALLY FILED - 2021 Mar 31 12:16 PM - ANDERSON - COMMON PLEAS - CASE#2021CP0400615

56.    The structured cash flow products sold purchasers such as Plaintiffs by Dixon were supposed to be secured by the rights to future income payments that FIP obtained from individual pensioners, as described above.

57.    Shurwest designed the IRA Reboot Program so that Plaintiffs would rely on and use the income stream from the FIP structured cash flow products to pay the premiums for their IUL policies, which were the tentpole of the IRA Reboot Program.

58.    Based on the advice, recommendation, and representations of Shurwest and Dixon, Plaintiffs purchased FIP structured cash flow products in conjunction with their purchases of IUL policies.

59.    In or around March 2017, Plaintiff Samuel Chaney submitted paperwork to FIP, through Dixon and Shurwest to establish a structured cash flow.

60.    The Chaney FIP structured cash flow was funded with $237,937.50 from existing savings and was set up to provide a return of the purchase price plus 7 % interest in equal monthly payments over a three-year term.

61.    In or around April 2017, Plaintiff Walter Blohm submitted paperwork to FIP, through Dixon and Shurwest to establish a structured cash flow.

62.    The Blohm FIP structured cash flow was funded with $211,729.98 from existing savings and was set up to provide a return of the purchase price plus 6.5% interest in equal monthly payments over a four-year term.

63.    In or around June 2017, Plaintiff Sara Kilpatrick submitted paperwork to FIP, through Dixon and Shurwest to establish a structured cash flow.

ELECTRONICALLY FILED - 2021 Mar 31 12:16 PM - ANDERSON - COMMON PLEAS - CASE#2021CP0400615

64.    The Kilpatrick FIP structured cash flow was funded with $172,935 from existing savings and was set up to provide a return of the purchase price plus 6.5% interest in equal monthly payments over a four-year term.

65.    In or around March 2018, Plaintiff Linda Davy submitted paperwork to FIP, through Dixon and Shurwest to establish a structured cash flow.

66.    The Davy FIP structured cash flow was funded with $70,000 from existing savings and was set up to provide a return of the purchase price plus 7.5% interest in equal monthly payments over a four-year term.

67.    In accordance with the recommendations of Shurwest and Dixon, Plaintiffs intended to use the income streams from the structured cash flow products to fund their IUL policies.

68.    Starting in January 2015, FIP became the subject of regulatory investigations that resulted in a steady stream of cease and desist orders, settlements, consent orders, assurances of compliance, and lawsuits in more than thirteen states and municipalities across the country.

69.    As a result of mounting regulatory pressure, FIP stopped collecting payments from pensioners, which deprived FIP of the revenue stream needed to make payments to structured cash flow purchasers, including Plaintiffs. As such, FIP payments to structured cash flow purchasers stopped in or about April 2018.

70.    This stoppage deprived Plaintiffs of the income streams they relied on and needed to pay the costly premiums for their IUL policies.

71.    In or around the middle of April 2018, FIP first provided notice to agents like Dixon that it would stop collecting payments from pensioners and distributing those

ELECTRONICALLY FILED - 2021 Mar 31 12:16 PM - ANDERSON - COMMON PLEAS - CASE#2021CP0400615

payments to structured cash flow investors like Plaintiffs. Plaintiffs subsequently learned from Dixon that FIP could no longer meet its obligations, and that payments from their FIP investment would stop. This was the first notice to Plaintiffs that the IRA Reboot Program was flawed and the first indication they had that they had suffered a financial loss by participating in that strategy.

72.     The stoppage of payments from FIP in April 2018 deprived Plaintiffs of the income stream they relied on to pay the costly premium for the IUL policies. Additionally, Plaintiffs lost the balance of their investment with FIP (purchase price of the structured cash flow less any payments received prior to April 2018).

73.     Without the monthly income stream, Plaintiffs were forced to pay the expensive premiums out of pocket or face the risk of policy lapse, after losing a significant portion of their retirement savings to FIP's collapse.

74.     As the regulatory actions against FIP make clear, the FIP structured cash flow products were inherently flawed and unsuitably risky. Moreover, FIP was later revealed to be an illegal Ponzi scheme that was orchestrated by a previously convicted felon. FIP and its principals have now been indicted by the Department of Justice for their roles in running a Ponzi scheme.

75.     The pairing of FIP structured cash flow products as a funding mechanism for Plaintiffs' IUL policies subjected Plaintiffs to unnecessary and inappropriate risks. These risks should have prevented Shurwest from incorporating FIP structured cash flow products in the design of the IRA Reboot Program and should have prevented Shurwest recommending that strategy to Dixon and Plaintiffs as a sound and safe retirement and financial plan.

ELECTRONICALLY FILED - 2021 Mar 31 12:16 PM - ANDERSON - COMMON PLEAS - CASE#2021CP0400615

76.    Ultimately, when FIP collapsed in April 2018, all the hard-earned and irreplaceable retirement savings that Plaintiffs invested with FIP was lost.

77.    The IUL policies as promoted, recommended, and sold to Plaintiffs were also inappropriate and not suitable for Plaintiffs given their ages, needs, and risk profiles.

78.    Specifically, the representations by the Shurwest that making IUL premium payments for only a set amount of time would result in tax-free income for life was a negligent misrepresentation.

79.    This and other misrepresentations by Shurwest were meant solely to induce Plaintiffs to purchase the IUL policies and deploy as much of their savings as possible to the funding of IUL premium payments, from which Shurwest made commissions, overrides, and referral fees.

80.    The IRA Reboot Program subjected Plaintiffs to unnecessary and unsuitable levels of risk.

81.    Shurwest should not have designed the IRA Reboot Program around the use of IUL policies and should not have recommended the use of IUL policies to Plaintiffs as a sound and safe retirement and financial planning strategy.

82.    Shurwest should not have designed the IRA Reboot Program around the concept of converting Plaintiffs' existing retirement savings into IUL policies and should not have recommended that Plaintiffs convert their existing retirement savings into IUL policies as a sound and safe retirement and financial planning strategy.

83.    Shurwest should not have recommended the use of FIP structured cash flow products as part of the IRA Reboot and as a sound and safe retirement and financial planning tool.

ELECTRONICALLY FILED - 2021 Mar 31 12:16 PM - ANDERSON - COMMON PLEAS - CASE#2021CP0400615

**FIRST CAUSE OF ACTION**
**(Negligence as to Shurwest)**

84.     Plaintiffs re-allege and incorporate by reference the preceding paragraphs of this Complaint as if fully set forth herein.

85.     Shurwest owed a duty to Plaintiffs to exercise reasonable care, skill, diligence, and prudence under the circumstances presented by Plaintiffs' financial situation and investment objectives.

86.     Shurwest breached its duty to Plaintiffs to exercise reasonable care, skill, diligence and prudence under the circumstances and these breaches caused Plaintiffs to suffer damages.

87.     The actions and inaction of Shurwest as set forth in this Complaint were negligent, grossly negligent, reckless, willful, and wanton, knowing and intentional.

88.     The conduct of Shurwest in the design, promotion, marketing, recommendation, and sale of the IRA Reboot Program constituted imprudence, negligence, gross negligence, recklessness, bad faith, and willful misconduct in one or more of the following particulars:

        a.     by placing its own interests ahead of Plaintiffs' by creating, designing, promoting, marketing, recommending, and selling a risky and flawed financial and retirement planning strategy that was imprudent, uninformed, conflicted, negligent, and reckless for Plaintiffs;

ELECTRONICALLY FILED - 2021 Mar 31 12:16 PM - ANDERSON - COMMON PLEAS - CASE#2021CP0400615

b.   by failing to conduct due diligence or adequate due diligence on the strategies and products they recommended to Plaintiffs;

c.   by repeatedly advocating and recommending risky strategies and products that failed to meet Plaintiffs' financial and retirement planning needs while guaranteeing substantial profits for Shurwest;

d.   by failing to advise Dixon and Plaintiffs of the conflicts of interest in their promotion of the IRA Reboot Program and conversion of Plaintiffs' existing savings into IUL policies;

e.   by failing to advise Dixon and Plaintiffs of the risks associated with liquidating their existing savings;

f.   by failing to advise Dixon and Plaintiffs of the risks associated with IUL policies;

g.   by failing to advise Dixon and Plaintiffs of the risks associated with IRA Reboot Program;

h.   Shurwest knew or should have known that the IRA Reboot Program was risky and unsuitable. Even so, they created, promoted, marketed, recommended, sold and implemented the strategy with Plaintiffs without adequately advising Dixon or Plaintiffs of the costs and risks associated with it;

ELECTRONICALLY FILED - 2021 Mar 31 12:16 PM - ANDERSON - COMMON PLEAS - CASE#2021CP0400615

i.    Shurwest knew or should have known that the IRA Reboot Program would subject Plaintiffs' existing retirement savings to unnecessary risk, loss, fees, costs, and penalties;

j.    Shurwest knew and failed to disclose to Dixon and Plaintiffs their own financial interests in recommending the IRA Reboot Program, including a complete disclosure of all fees, costs, commissions, and overrides that would be paid to Shurwest;

k.    Shurwest failed to ascertain or understand the nature and type of insurance and financial products they promoted to Dixon and Plaintiffs and whether or not they were suitable for Plaintiffs given their ages, needs, risk profile and financial position nearing retirement;

l.    Shurwest recommended IUL policies to Dixon and Plaintiffs when they knew or should have known that these policies were risky and not reasonable or prudent for Plaintiffs;

m.    Shurwest recommended FIP structured cash flow products to Dixon and Plaintiffs when they knew or should have known that these products were risky and not reasonable or prudent for Plaintiffs;

n.    Shurwest employees and agents knowingly and intentionally altered information on insurance applications before submitting them to insurance companies.

ELECTRONICALLY FILED - 2021 Mar 31 12:16 PM - ANDERSON - COMMON PLEAS - CASE#2021CP0400615

89.    In one or more of the preceding particulars, Shurwest acted with imprudence, negligence, gross negligence, recklessness, willful misconduct, fraudulent intent, and bad faith and thereby breached the common law duties of care owed to Plaintiffs, proximately causing Plaintiffs to suffer damages.

90.    Plaintiffs are therefore entitled to and pray for 1) actual damages; 2) consequential damages; 3) punitive damages for gross negligence, recklessness, willful misconduct, bad faith, misrepresentations, and omissions in an amount to be determined by the trier of fact; 4) costs; 5) prejudgment interest at the highest legal rate, and 6) such other relief as is just, equitable, and proper.

## SECOND CAUSE OF ACTION
### (Aiding and Abetting the Breach of a Fiduciary Duty as to Shurwest)

91.    Plaintiffs re-allege and incorporate by reference the preceding paragraphs of this Complaint as if fully set forth herein.

92.    Dixon and Black Harbor owed fiduciary duties to the Plaintiffs, which were breached.

93.    Upon information and belief, Shurwest had knowledge of the underlying fiduciary duties and breaches thereof because they knew or should have known:

    a.    Dixon was providing financial planning and retirement advice to Plaintiffs;

    b.    Dixon owed fiduciary duties to Plaintiffs;

    c.    Shurwest educated, trained, and supported Dixon on all aspects of the IRA Reboot Program and Plaintiffs' participation in the program;

ELECTRONICALLY FILED - 2021 Mar 31 12:16 PM - ANDERSON - COMMON PLEAS - CASE#2021CP0400615

d.    Shurwest agents and employees knowingly altered and falsified information on insurance applications before submitting them to the insurance companies;

e.    Shurwest knowingly concealed the sources of funds that Plaintiffs were using to purchase and fund their IUL policies from the insurance companies that issued them;

f.    Shurwest recommended FIP structured cash flow products to Dixon and knew that Dixon recommended them to Plaintiffs;

g.    Shurwest knew Plaintiffs placed substantial amounts of money with FIP and thus FIP owed fiduciary duties to Plaintiffs with regard to those funds;

h.    Shurwest knew or should have known of the risk associated with the IRA Reboot Program and FIP structured cash flows, yet they did not act to protect Plaintiffs' interests or disclose those risks to Plaintiffs.  Instead, Shurwest profited from the marketing and sale of the IRA Reboot Program and FIP structured cash flow products;

i.    Shurwest knowingly processed self-dealing transactions with known conflicts of interest;

j.    Shurwest knowingly processed improper transactions;

k.    Shurwest knowingly processed transactions that benefitted a fiduciary while clearly adverse to the best interests of Plaintiffs;

ELECTRONICALLY FILED - 2021 Mar 31 12:16 PM - ANDERSON - COMMON PLEAS - CASE#2021CP0400615

94.    Shurwest knowingly participated in and encouraged the underlying breaches of fiduciary duties despite purporting to avoid knowing what would otherwise be obvious about the underlying breaches of fiduciary duty.

95.    In one or more of the preceding particulars, Shurwest aided and abetted and substantially assisted in the breaches of fiduciary duties owed to Plaintiffs, proximately causing them damages.

96.    Plaintiffs are therefore entitled to and pray for 1) actual damages; 2) consequential damages; 3) punitive damages; 4) attorney's fees; 4) costs; 5) prejudgment interest at the highest legal rate, and 6) such other relief as is just, equitable, and proper.

### THIRD CAUSE OF ACTION
### (Negligent Misrepresentation as to Shurwest)

97.    Plaintiffs re-allege and incorporate by reference the preceding paragraphs of this Complaint as if fully set forth herein.

98.    Dixon, as an agent of Shurwest, provided insurance, financial planning and retirement advice to Plaintiffs and thus owed Plaintiffs a duty to do so with reasonable care, skill, diligence, and prudence.

99.    Dixon, as an agent of Shurwest, breached that duty to Plaintiffs and acted with negligence by failing to conduct adequate due diligence on the IRA Reboot Program, IUL policies, FIP structured cash flow products, the risks associated with each of them, collectively and individually, and by recommending them to Plaintiffs.

100.    Dixon, as an agent of Shurwest, also breached duties to Plaintiffs and acted with negligence by failing to accurately characterize, disclose and describe the IRA Reboot Program, IUL Policies, FIP structured cash flow products, and the risks

ELECTRONICALLY FILED - 2021 Mar 31 12:16 PM - ANDERSON - COMMON PLEAS - CASE#2021CP0400615

associated with each of them, individually and collectively, and by recommending them to Plaintiffs.

101.    Dixon, as an agent of Shurwest, made multiple misrepresentations to Plaintiffs about the IRA Reboot Program, IUL Policies, FIP structured cash flow products and the risks associated with them both collectively and individually. Chief among these misrepresentations were the recommendation of the IRA Reboot Program as a prudent and suitable financial and retirement planning strategy.

102.    In each instance, Dixon's misrepresentations to Plaintiffs were based on and repeated Shurwest's misrepresentations to Dixon regarding the IRA Reboot Program, IUL Policies, FIP structured cash flow products, and the risks associated with them both collectively and individually.

103.    The acts and omissions of Shurwest and Shurwest's agent constitute negligence and gross negligence because they are an extreme departure from what a reasonably careful and prudent person would do in the same or similar circumstances to protect Plaintiffs from unreasonable and unnecessary risks.

104.    The negligence, gross negligence, and negligent misrepresentations of Shurwest and Shurwest's agent as set forth above, proximately caused Plaintiffs to suffer damages.

105.    Plaintiffs are therefore entitled to and pray for: 1) actual damages; 2) consequential damages; 3) punitive damages for gross negligence, recklessness, willful misconduct, bad faith, misrepresentations, and omissions in an amount to be determined by the trier of fact; 4) costs; 5) prejudgment interest at the highest legal rate, and 6) such other relief as is just, equitable, and proper.

ELECTRONICALLY FILED - 2021 Mar 31 12:16 PM - ANDERSON - COMMON PLEAS - CASE#2021CP0400615

## FOURTH CAUSE OF ACTION
### (State Securities Violations as to Shurwest)

106.    Plaintiffs re-allege and incorporate by reference the preceding paragraphs of this Complaint as if fully set forth herein.

107.    In the course of their fiduciary duties to Plaintiffs, Shurwest recommended and advised Plaintiffs to execute unsuitable transactions involving *inter alia*, the sale of securities.  Shurwest did so by advising Plaintiffs to sell securities and liquidate their holdings in a traditional savings account (*e.g.* IRA accounts) and use the funds generated from those sales to invest and participate in the IRA Reboot Program as set forth in detail above.

108.    In making these representations to Plaintiffs, Shurwest misrepresented the risks of the liquidating their existing, traditional savings, the IRA Reboot Program, IUL Policies and FIP structured cash flow products to Plaintiffs and defrauded them.

109.    Shurwest also failed to disclose to Plaintiffs the gross conflicts of interest that existed when they advised them about the IRA Reboot Program, IUL Policies and FIP funding mechanisms, including but not limited to the way Shurwest was being compensated for the advice and recommendations they made to Plaintiffs.

110.    The actions of Shurwest were wrongful, fraudulent and in violation of S.C. Code Ann. §§ 35-1-401 *et seq.* and §§ 35-1-501 *et seq.* and the regulations on broker licensing and conduct established thereunder.

111.    As a consequent and proximate result of the fraud perpetrated by Shurwest, Plaintiffs suffered substantial damages.

22

ELECTRONICALLY FILED - 2021 Mar 31 12:16 PM - ANDERSON - COMMON PLEAS - CASE#2021CP0400615

112.    Plaintiffs are therefore entitled to and pray for: 1) actual damages, 2) costs, 3) attorneys' fees, 4) prejudgment interest at the highest legal rate, and 5) such other relief as is just, equitable and proper.

### FIFTH CAUSE OF ACTION
**(South Carolina Unfair Trade Practices as to Shurwest)**

113.    Plaintiffs re-allege and incorporate by reference the preceding paragraphs of this Complaint as if fully set forth herein.

114.    To the extent that the IRA Reboot Program, IUL Policies, FIP structured cash flow products, or any accompanying product or service recommended or sold to Plaintiffs are not considered "securities" under South Carolina law, Shurwest engaged in unfair methods of competition and unfair or deceptive acts and practices in the conduct of trade or commerce.

115.    Shurwest's unfair acts and practices included:

    a.    Recommending and implementing the IRA Reboot Program;

    b.    Recommending a purported financial and retirement planning strategy that involved the conversion of Plaintiffs' existing wealth and savings into unsuitable IUL policies;

    c.    Pairing the unsuitable IUL policies with an investment in what turned out to be a Ponzi scheme in order to boost the size of the IUL policies;

    d.    Recommending and assisting Plaintiffs participate in the IRA Reboot Program with the knowledge that doing so would decimating their retirement savings and plans for the future, as set forth in detail above.

ELECTRONICALLY FILED - 2021 Mar 31 12:16 PM - ANDERSON - COMMON PLEAS - CASE#2021CP0400615

116.    The unfair and deceptive acts and practices committed by Shurwest in the conduct of their trade and commerce have a potential for repetitive impact on the public interest.  Indeed, these acts and practices were repeated throughout the State of South Carolina as Plaintiffs are but one group of dozens of South Carolina residents who were induced into participating in the IRA Reboot Program by Shurwest and its agents.

117.    Such unfair acts and practices constitute a violation of the Unfair Trade Practices Act, S.C. Code Ann. § 39-5-10 *et seq.* (1976) (as amended).

118.    Insofar as they do not involve securities, Shurwest's unfair acts and practices described above constitute willful, intentional, and knowing violations of the Unfair Trade Practices Act.

119.    Plaintiffs have suffered damages as the result of Shurwest's unfair and deceptive acts and practices in that they have suffered losses of their hard-earned and irreplaceable savings, paid substantial amounts of money for unsuitable expensive IUL policies and incurred fees and costs that have decimated their financial and retirement plans.

120.    Plaintiffs are therefore entitled to and pray for 1) actual damages, 2) consequential damages, 3) treble damages, 4) attorneys' fees pursuant to the Unfair Trade Practices Act, 5) costs, and 6) such other further relief as is just, equitable and proper.

<u>**SIXTH CAUSE OF ACTION**</u>
**(Negligent Supervision as to Shurwest)**

121.    Plaintiffs re-allege and incorporate by reference the preceding paragraphs of this Complaint as if fully set forth herein.

ELECTRONICALLY FILED - 2021 Mar 31 12:16 PM - ANDERSON - COMMON PLEAS - CASE#2021CP0400615

122.    At all times relevant to the events described in this Complaint, Miller was an employee and agent of Shurwest as its National Sales Director for Life Insurance.  As such, Shurwest is responsible and liable for the acts and omissions of Miller (and all other Shurwest agents and employees) under the doctrine of *respondeat superior.*

123.    At all times relevant to the events described in this Complaint, Miller was party to a contract of employment with Shurwest.

124.    As set forth herein, Miller designed, promoted, marketed, and recommended the IRA Reboot Program and FIP structured cash flow products to Shurwest's network of insurance agents.

125.    Miller and other Shurwest agents and employees introduced and educated agents on the IRA Reboot Program and FIP structured cash flow products.

126.    Miller and other Shurwest agents and employees assisted agents in processing applications for insurance policies, interacted with insurers, handled insurance policies, and supported agents at each step of the IRA Reboot Program.

127.    Miller and other Shurwest employees and agents controlled each step of the IRA Reboot Program and Plaintiffs' participation in same.

128.    Miller and other Shurwest agents and employees undertook these activities within the scope of their employment with Shurwest.

129.    Miller and other Shurwest agents and employees by their actions and omissions as described herein, intentionally caused harm to Plaintiffs while using property and resources that belonged to Shurwest and were provided to Miller and other Shurwest agents and employees by Shurwest.

ELECTRONICALLY FILED - 2021 Mar 31 12:16 PM - ANDERSON - COMMON PLEAS - CASE#2021CP0400615

130.    Shurwest knew or should have known that it had the ability to control Miller and other Shurwest agents and employees and prohibit them from promoting, marketing, and recommending the IRA Reboot Program and FIP structured cash flow products to Shurwest's network of insurance agents and retirement advisors.

131.    Shurwest knew or should have known that Miller and other Shurwest agents and employees were promoting, marketing, and recommending the IRA Reboot Program and FIP structured cash flow products to Shurwest's network of insurance agents.

132.    There was a need and there were numerous opportunities for Shurwest to exercise control over Miller and other Shurwest agents and employees to prevent them from promoting, marketing, and recommending the IRA Reboot Program and FIP structured cash flow products to Shurwest's network of insurance agents.

133.    Exercising such control over Miller and other Shurwest agents and employees would have prevented the harm suffered by Plaintiffs caused by their participation in the IRA Reboot Program.

134.    Miller and other Shurwest agents and employees promoted, marketed, and recommended the IRA Reboot Program and FIP structured cash flow products to Shurwest's network of insurance agents over several years.

135.    Shurwest did or could have reasonably anticipated that Plaintiffs would be harmed by the actions and omissions of Miller and other Shurwest agents and employees regarding the IRA Reboot Program and FIP structured cash flow products.

136.    Shurwest failed to exercise control over Miller and other Shurwest agents and employees, and their failure to do so was negligent, grossly negligent, reckless, willful, and in bad faith.

ELECTRONICALLY FILED - 2021 Mar 31 12:16 PM - ANDERSON - COMMON PLEAS - CASE#2021CP0400615

137.   As such, Shurwest owes a duty of care to Plaintiffs, which has been breached. Plaintiffs have suffered harm as a proximate cause of that breach.

138.   Plaintiffs are therefore entitled to and pray for: 1) actual damages, 2) consequential damages, 3) punitive damages for gross negligence, recklessness, willful misconduct, bad faith, misrepresentations and omissions in an amount to be determined by the trier of fact, 4) costs, 5) prejudgment interest at the highest legal rate, and 6) such other relief as is just, equitable, and proper.

## **PRAYER FOR RELIEF**

WHEREFORE, having set forth their claims, Plaintiffs pray for a judgment against the Defendant as follows:

A.  For actual damages;

B.  For consequential damages;

C.  For punitive damages to be determined by the finder of fact;

D.  For treble damages pursuant to S.C. Code Ann. § 39-5-10 *et seq.*;

E.  For prejudgment interest at the highest legal rate;

F.  For the costs of this action;

G.  For reasonable attorneys' fees;

H.  For such other relief as is just, equitable and proper.

## **JURY DEMAND**

Plaintiffs demand a trial by jury on all issues.

ELECTRONICALLY FILED - 2021 Mar 31 12:16 PM - ANDERSON - COMMON PLEAS - CASE#2021CP0400615

Respectfully submitted,

**RIKARD & PROTOPAPAS, LLC**

s/ Robert G. Rikard

Robert G. Rikard (SC Bar 12340)
Jeremy C. Hodges (SC Bar 71123)
George M. Pappas, Jr. (SC Bar 103963)
1329 Blanding Street
Columbia, SC 29201
Post Office Box 5640 (29250)
PH: (803) 978-6111
FAX: (803) 978-6112
EMAIL: rgr@rplegalgroup.com
         jhodges@rplegalgroup.com
         gmp@rplegalgroup.com

*Attorneys for Plaintiffs*

March 31, 2021
Columbia, South Carolina

ELECTRONICALLY FILED - 2021 Apr 08 9:19 AM - ANDERSON - COMMON PLEAS - CASE#2021CP0400615

# EXHIBIT "A"

ELECTRONICALLY FILED - 2021 Apr 08 9:19 AM - ANDERSON - COMMON PLEAS - CASE#2021CP0400615

| | |
|---|---|
| STATE OF SOUTH CAROLINA<br>COUNTY OF RICHLAND | IN THE COURT OF COMMON PLEAS<br>FIFTH JUDICIAL CIRCUIT |

Dolores Stegelin, Wayne Gugel, and Anne H. Rack,

      Plaintiffs,

        vs.

Chris Dixon and Black Harbor Wealth Management, LLC, Faw Casson & Co., LLP, Shurwest, LLC, Agee, Fisher, Barret, LLC, Securian Financial Group, Inc., Minnesota Life Insurance Company, and Minnesota Companies, Inc.

      Defendants.

Civil Action No. 2019-CP-40-00507

**AFFIDAVIT OF TAMI HILL**

Shurwest, LLC

      Third-Party Plaintiff,

        vs.

MJSM Financial, LLC and Melanie Schulze-Miller,

      Third-Party Defendants.

PERSONALLY APPEARING BEFORE ME, the undersigned, who deposes and states as follows:

I, Tami Hill, am over eighteen years of age and make the following statement under oath and of my own personal knowledge and belief

1.     From September of 2017 through September of 2018, I was an employee of Shurwest, LLC in Phoenix, Arizona. My position at Shurwest was Service Manager in the Life Insurance Division.

ELECTRONICALLY FILED - 2021 Apr 08 9:19 AM - ANDERSON - COMMON PLEAS - CASE#2021CP0400615

2.     During the time period that Future Income Products ("FIP") was being marketed at Shurwest by Melanie Schulze Miller, Mike Seabolt and Nick Johnson, I have knowledge that Jim Maschek was fully aware that FIP was being marketed by these employees.

3.     Furthermore, it was common knowledge throughout the Shurwest Office that Shurwest representatives were using FIP to fund Minnesota Life insurance policies.

4.     Beginning in April of 2018 after FIP stopped making payments to clients, I was told by my superiors at Shurwest to delete anything that had FIP on it out of the computer system. In May 2018, Mia Shurts, the wife of Ron Shurts came to the Shurwest office while we were working as directed to remove everything from the computer system that related to FIP.

5.     Thereafter, while I was still employed by Shurwest, Shurwest employees were stating that Shurwest was going to change its name to Quantum due to the lawsuits and problems associated with FIP.

FURTHER AFFIANT SAYETH NOT.



Tami Hill

SWORN TO AND SUBSCRIBED before me
this _____ day of _____, 2021

Notary Public for the State of Arizona
My commission expires: July 11, 2024

CYNTHIA A AGANS
Notary Public · Arizona
Maricopa County
Commission # 582563
My Comm. Expires Jul. 11, 2024

# EXHIBIT B

ENTITY INFORMATION

Search Date and Time: 4/29/2021 4:27:48 PM

Entity Details

Entity Name:

SHURWEST, LLC

Entity ID:

L19861696

Entity Type:

Domestic LLC

Entity Status:

Active

Formation Date:

5/8/1992

Reason for Status:

In Good Standing

Approval Date:

3/13/2015

Status Date:
Original Incorporation Date:

5/8/1992

Life Period:

Perpetual

Business Type:
Last Annual Report Filed:
Domicile State:

Arizona

Annual Report Due Date:

Years Due:

Original Publish Date:

Statutory Agent Information

4/29/2021                                   Arizona Corporation Commission

Name:

ANDY M KVESIC

Appointed Status:

Active 7/5/2019

Attention:

Address:

17550 N PARIMETER DRIVE SUITE 300, SCOTTSDALE, AZ 85255, USA

Agent Last Updated:

7/5/2019

E-mail:

Attention:

Mailing Address:

17550 N PARIMETER DRIVE SUITE 300, SCOTTSDALE, AZ 85255, USA

County:

Maricopa

Principal Information

| Title | Name | Attention | Address | Date of Taking Office | Last Updated |
|-------|------|-----------|---------|----------------------|--------------|
| Member | SHURWEST HOLDING COMPANY INC | | 17550 N PERIMETER DR STE 300, SCOTTSDALE, AZ, 85255, USA | 6/22/2017 | 6/26/2017 |
| Member | KT EQUITY PARTNERS III LLC | | 2950 SW MCCLURE RD, TOPEKA, KS, 66614, USA | 6/22/2017 | 6/26/2017 |

Page 1 of 1, records 1 to 2 of 2

Address 

Attention:

Address: 17550 N PERIMETER DR STE 300, SCOTTSDALE, AZ, 85255, USA

County: Maricopa

Last Updated: 2/24/2015

Privacy Policy (http://azcc.gov/privacy-policy) | Contact Us (http://azcc.gov/corporations/corporation-contacts)

4/29/2021                                    Arizona Corporation Commission

Entity Principal Office Address

Attention:

Address:

County:

Last Updated:

Back    Return to Search

Return to Results

Document History        Name/Restructuring History

Pending Documents        Microfilm History

# EXHIBIT C

Delaware.gov

Governor | General Assembly | Courts | Elected Officials | State Agencies

## State of Delaware
### The Official Website of the First State

**Department of State: Division of Corporations**

Allowable Characters

HOME

**Entity Details**

**THIS IS NOT A STATEMENT OF GOOD STANDING**

| File Number: | 5695673 | Incorporation Date / Formation Date: | 2/18/2015 (mm/dd/yyyy) |
| Entity Name: | KT EQUITY PARTNERS III, LLC | | |
| Entity Kind: | Limited Liability Company | Entity Type: | General |
| Residency: | Domestic | State: | DELAWARE |

**REGISTERED AGENT INFORMATION**

| Name: | COGENCY GLOBAL INC. | | |
| Address: | 850 NEW BURTON ROAD SUITE 201 | | |
| City: | DOVER | County: | Kent |
| State: | DE | Postal Code: | 19904 |
| Phone: | 800-483-1140 | | |

Additional Information is available for a fee. You can retrieve Status for a fee of $10.00 or more detailed information including current franchise tax assessment, current filing history and more for a fee of $20.00.

Would you like ○ Status ○ Status,Tax & History Information

[ Submit ]

[ View Search Results ]     [ New Entity Search ]

For help on a particular field click on the Field Tag to take you to the help area.

site map  |  privacy  |  about this site  |  contact us  |  translate  |  delaware.gov

# EXHIBIT D



KANSAS SECRETARY OF STATE    *492-703-4*
**Foreign Limited Liability**
**Company Application**
FL-51-10

| 3515    01 | FILED BY KS SOS |
| 051    010 | 06-17-2015 |
| $165.00    1 | 03:11:10 PM |
| | FILE#: 4927034 |

04209277

**Kansas Office of the Secretary of State:**

Memorial Hall, 1st Floor
120 S.W. 10th Avenue
Topeka, KS 66612-1594

(785) 296-4564
kssos@sos.ks.gov
www.sos.ks.gov

Instructions: All information must be completed or this document will not be accepted for filing.

| 1. | Name of limited liability company  *Must match the name on record with the home state* | KT EQUITY PARTNERS III, LLC | | | |
|---|---|---|---|---|---|
| 2. | State/Country of organization | DELAWARE | | | |
| 3. | Date of organization in home state | Month **02** | Day **18** | Year **2015** | |
| 4. | Began doing business in Kansas | ☒ Upon qualification    ☐ Date | Month | Day | Year |

| 5. | Name of resident agent and address of registered office in Kansas  *Must be a Kansas street address. A P.O. Box is unacceptable.* | Name  **DAVID CALLANAN** |
|---|---|---|
| | | Street Address  **2950 SW MCCLURE RD.** |
| | | City  **TOPEKA**    State  **KS**    Zip  **66614** |

| 6. | Mailing address  *Address will be used to send official mail from the Secretary of State's Office.* | Attention Name  **DAVID WOLFE** |
|---|---|---|
| | | Address  **2950 SW MCCLURE RD.** |
| | | City  **TOPEKA**    State  **KS**    Zip  **66614**    Country  **USA** |

| 7. | Tax closing month | Dec  ~~2015~~ |
|---|---|---|

**1 / 2**  K.S.A. 17-76, 121
Rev. 04/21/15 tc

Please continue to next page.

| 8. | Full nature and character of the business to be conducted in Kansas | Investment Holding Company |
|---|---|---|

| 9. | If management vests with members, please provide the name and address of each member. | | | | |
|---|---|---|---|---|---|
| | | **Name 1** DAVID CALLANAN | | | |
| | | **Address** 2950 SW MCCLURE RD | | | |
| | If management vests with managers, please provide the name and address of each manager | **City** TOPEKA | **State** KS | **Zip** 66614 | **Country** USA |
| | | **Name 2** DEREK THOMPSON | | | |
| | Do not leave blank. If additional space is needed please provide and attachment. | **Address** 2950 SW MCCLURE RD | | | |
| | | **City** TOPEKA | **State** KS | **Zip** 66614 | **Country** USA |
| | | **Name 3** CODY FOSTER | | | |
| | | **Address** 2950 SW MCCLURE RD | | | |
| | | **City** TOPEKA | **State** KS | **Zip** 66614 | **Country** USA |
| | | **Name 4** JORDAN CANFIELD | | | |
| | | **Address** 2950 SW MCCLURE RD | | | |
| | | **City** TOPEKA | **State** KS | **Zip** 66614 | **Country** USA |

10. The limited liability company hereby consents, without power of revocation, that actions may be commenced against it in the proper court of any county in the state of Kansas where there is a proper venue by service of process on the Secretary of State of the state of Kansas; and the limited liability company stipulates and agrees that such service shall be taken and held in all courts to be valid and binding as if due service had been made upon the members of the foreign limited liability company.

11. I declare under penalty of perjury under the laws of the state of Kansas that the foregoing is true and correct, and that the company is in good standing in its home state, and I have remitted the required fee.

| Signature of Manager or Member | Month 06 | Day 16 | Year 2015 |
|---|---|---|---|

**2 / 2**  K.S.A. 17-76, 121
Rev. 04/21/15 tc

| Please review to ensure completion. |
|---|

NOT A CERTIFIED WEB COPY — KANSAS SECRETARY OF STATE



# Delaware

PAGE 1

## The First State

I, JEFFREY W. BULLOCK, SECRETARY OF STATE OF THE STATE OF DELAWARE, DO HEREBY CERTIFY "KT EQUITY PARTNERS III, LLC" IS DULY FORMED UNDER THE LAWS OF THE STATE OF DELAWARE AND IS IN GOOD STANDING AND HAS A LEGAL EXISTENCE SO FAR AS THE RECORDS OF THIS OFFICE SHOW, AS OF THE SEVENTH DAY OF MAY, A.D. 2015.



Jeffrey W. Bullock, Secretary of State

AUTHENTICATION: 2357305

DATE: 05-07-15

5695673  8300

150524607

You may verify this certificate online
at corp.delaware.gov/authver.shtml